**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 22-cr-20220-MOORE

UNITED STATES OF AMERICA

v.

PEDRO ROSARIO SANTANA and
FRANKLIN DOMINGUEZ,

     Defendants.

_____/

**REPORT AND RECOMMENDATION**

**THIS CAUSE** is before the Court upon Defendants' Joint Motion to Dismiss Indictment ("Motion") (ECF No. 16). The Motion has been referred to the undersigned for disposition by the Honorable K. Michael Moore, United States District Court Judge (ECF No. 9). The Government filed a Response (ECF No. 19), to which Defendants filed a Reply (ECF No. 20). An evidentiary hearing was conducted on September 16, 2022. Both sides sought an opportunity to advance supplemental briefing after the hearing, which was permitted and considered. Upon consideration of the Motion, Response, Reply, supplemental briefings, the record as a whole, and with the benefit of the Parties' positions advanced at the hearing, it is my recommendation that Defendants' Motion be **DENIED**.

## I.    BACKGROUND FACTS

According to the complaint filed in this matter, law enforcement first encountered Defendants Pedro Rosario Santana and Franklin Dominguez on April 19, 2022, approximately 77 nautical miles southeast of Isla Beata, Dominican Republic. Maritime patrol officers located a "go-fast vessel" ("GFV") adrift and covered by a tarp. Aerial patrol officers observed packages

1

drifting around the GFV and collected seven packages from the water.  The contents field tested positive for the presence of cocaine; 210 kilograms in total were recovered.

The GFV had no indicia of nationality.  When questioned, the Defendants did not claim a nationality for the GFV.  The Officers accordingly treated the vessel as one without nationality, subject to the jurisdiction of the United States.  Santana and Dominguez were detained aboard the Navy vessel *Wichita*.

On May 12, 2022, they arrived in the Southern District of Florida, where they were transferred to the custody of federal agents.  Agents from the Drug Enforcement Agency ("DEA") interviewed Defendants after they waived their *Miranda* rights.  Each Defendant admitted his knowing involvement in the transportation of cocaine from Venezuela.

On May 13, 2022, Defendants were charged by complaint with conspiracy to possess with intent to distribute a controlled substance while on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code, Section 70503(a)(1), and possession with intent to distribute a controlled substance, in violation of Title 46, United States Code, Section 70506(b) (ECF No. 1).  On May 26, 2022, a federal grand jury returned an indictment charging Defendants with the same offenses (ECF No. 5).  Following their arraignment, Defendants filed this Joint Motion to Dismiss the indictment.

Defendants argue that this Court lacks jurisdiction over this offense on the grounds that at the time of interception, the GFV was located in waters that are part of the Exclusive Economic Zone ("EEZ") of the Dominican Republic, which Defendants argue is not in the "high seas" as defined by customary international law; the offense, therefore, falls outside of Congress's limited power arising under Article I, Section 8 to "define and punish . . . Felonies committed on the high Seas." *See* U.S. Const. art I, § 8, cl. 10.

Defendants' second ground for seeking dismissal of the indictment arises from the unreasonable and unnecessary delay in their detention, for more than three weeks, without judicial oversight.  The Motion seeks dismissal as a sanction for the violation of Federal Rule of Criminal Procedure 5 or alternatively, as a sanction for the outrageousness of the Government's conduct. Though it was not raised in the Motion, Defendants additionally invoked the Speedy Trial Act and argued at the evidentiary hearing that the Act mandated dismissal of the indictment with prejudice for the Government's failure to secure an indictment within thirty days of their arrest.

Finally, Defendants argued that the Government had failed to demonstrate a statutory basis for invoking the United States' jurisdiction over the GFV under the Maritime Drug Enforcement Act ("MDLEA").  Specifically, the Motion argued that the Government had failed to proffer that the Defendants were asked the necessary questions for the master or individual in charge whether he wished to make a claim of nationality or registry.

An evidentiary hearing was conducted on September 16, 2022.  The Government presented three witnesses.  First, Peter Hutchinson was presented to testify about his knowledge of Coast Guard procedures generally, and his knowledge of events that occurred in this case based on his review of documents.  Hutchinson is part of the Coast Guard enforcement branch, District 7, which operates out of San Juan, Puerto Rico.  Alexis Figueroa, Customs and Border Patrol Officer, testified about his interaction with the Defendants when they were first encountered at sea, and his questioning to determine nationality of the vessel.  Finally, DEA Special Agent Brian Smith testified about his arrest of Defendants when they arrived in Miami on May 12, 2022, including his interrogation of Defendants post-*Miranda*.  With the benefit of this testimony and exhibits entered at the hearing, I make the following findings.

The law enforcement officers who initially encountered Defendants were part of a task force that included a Canadian ship HMCS *Harry DeWolf* and the Navy vessel *Wichita*. This task force operates in the Caribbean Sea to monitor ships suspected of drug trafficking. While patrolling, if a vessel of interest is identified, Hutchinson explained that tactical control of the *Wichita* changes over to his District and it becomes a law enforcement activity. When a vessel of interest is spotted—one without indicia of nationality, possibly concealed with tarps, and/or carrying extra fuel—the officer who has spotted it generates an "alpha" report, which describes his reasonable suspicion and recommendation for a right of visit boarding. The purpose of the right of visit is to determine nationality, including inspection of any documentation for the vessel. If his superior officer agrees and issues a statement of no objection, a right of visit will be conducted.

The interdiction of Defendants Santana and Dominguez occurred 780 nautical miles directly from Miami, Florida, as the crow flies. For ship travel, considering land masses between the two points, the distance would be approximately 1,000 nautical miles. The closest land to the interdiction was the Dominican Republic, approximately 77 nautical miles away, and beyond the territorial seas of that Country. Defendants' vessel was in a known drug trafficking route.

Officer Figueroa conducted the right of visit to Defendants' vessel, which displayed no flag. Officer Figueroa boarded and took "positive control" over the vessel. Using a form sheet that provides a script of questions, he asked the Defendants collectively if there was a master of the vessel. Neither responded. Then, he asked them individually and each denied being the master of the vessel. Officer Figueroa then asked the Defendants collectively if they wanted to make a claim of nationality, to which both answered in the negative; he asked each of them individually and again, they each said no. Officer Figueroa, a certified linguist for the Coast Guard, conducted

his questioning of the Defendants in Spanish and ascertained their ability to understand him. Officer Figueroa conveyed the answers back to his team leader, who in turn communicated the information further to the United States Government (unspecified), and the response was communicated back to him to treat the vessel as without nationality.

Next, the officers conducted a law enforcement boarding.  The officers followed a check list for the law enforcement boarding, which includes investigative steps like taking pictures and testing the contraband.  When the contraband onboard tested positive for the presence of cocaine, the officers requested and received permission to treat the Defendants as detainees.  Hutchinson explained that once the task force officers have "PC" (probable cause), the detainees are brought onboard the Naval ship.

As a matter of general practice, at this point in the interdiction the USCG enforcement officers submit a case summary to headquarters, where it is reviewed before submission to the Department of Justice for decision on whether to accept prosecution, and determination of where the case will be prosecuted.  Hutchinson referred to this determination as "disposition," and testified that it typically takes five to seven days before DOJ communicates disposition back to the USCG.  These communications are sent and received via e-mail.  While the USCG task force awaits the DOJ disposition, it continues on its mission patrolling its area of responsibility.

The Defendants were not immediately moved onto the *Harry DeWolf* or *Wichita* but spent the first night following law enforcement interdiction on their disabled vessel.  On April 20, Defendants boarded the first of what would be nine vessels before arriving in Miami, Florida on May 12.  These transfers were just part of a routine process that allows the task force to continue operating in its area of patrol; there was no evidence of any emergency circumstances that contributed to the course of action described below.

The first vessel on which Defendants were detained, the *Wichita*, is a U.S. Navy warship, not equipped to hold detainees for a long period of time.  Upon arrival, the Defendants were processed: they were assessed as to their health, frisk searched, issued toiletries and a Tyvek jumpsuit to wear, and afforded a shower.  Hutchinson explained the conditions of detention generically.  The practice is to keep detainees in leg shackles, and generally, they are unshackled only for using the bathroom or showering.  Detainees are confined on the deck of the ship and provided some form of cover or shade, which may be a tarp or tent, but they are to some extent exposed to the elements, including sea water spray.  According to the supervision log introduced at the hearing (ECF No. 45-3), the Defendants were housed on the boat deck of the *Wichita*.

After one day on the *Wichita*, Defendants were transferred to a USCG cutter out of San Juan because the *Wichita* had another obligation.  Each time the Defendants were transferred, they were again searched.  On April 23, the Defendants were transferred to another vessel, this time because the vessel they were on was returning to San Juan.  Hutchinson defended the decision not to bring the Defendants into port on the vessel that was going to San Juan because they were still awaiting disposition from DOJ; until they are notified of the prosecuting District, the practice is to keep detainees outside United States territorial waters.

Defendants were transferred again on April 24 to the USCG Cutter *Heriberto Hernandez*.  On April 25, the Coast Guard received disposition from the DOJ, indicating that the U.S. Attorney's Office for the Southern District of Florida, located in Miami, would accept prosecution.  Hutchinson explained that once they had disposition identifying Miami as the location for prosecution, the Coast Guard began making efforts to get Defendants closer to a ship that could transport them to this District.  Thus, the next day, Defendants were transferred off of the *Heriberto*

*Hernandez* because it was headed to Puerto Rico for maintenance. Defendants were again transferred on April 29, this time to a ship that had just entered the Caribbean to conduct its patrol.

Also on April 29, the supervision log notes that the Defendants were both provided medical checks; Defendant Santana was prescribed hydrocortisone as a result. The log notes daily administration of medicine to both Defendants until they were again transferred. Medical records filed under seal after the hearing memorialize administration of pain medicine to Dominguez. Santana's treatment notes memorialize various medicines administered for multiple ailments, noting an onset date of April 27, about one week into his detention with the USCG.

On May 5 Defendants were transferred back to the *Wichita*, which made a port visit in Guantanamo, Cuba; then on May 9, to the *Raymond Evans*, which has a home port in Key West, Florida in this District; ultimately, on May 11, to the *Flores*, which makes its home port in Miami, Florida.

Arresting DEA Agent Smith learned that the Defendants would be coming to Miami at the time disposition was made. He arranged to meet the Defendants on May 12 upon their arrival at the port in Miami. He intended to interview them here and did so. He explained such interviews can be very valuable.

## II.    LEGAL STANDARD

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12, which provides that a party "may raise by pretrial motion any defense, objection or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(1). A motion alleging a defect in the indictment must be raised before trial, unless the defect is regarding the district court's lack of jurisdiction or failure to state an offense, which may be brought at any time while a case is pending. *See United States v. Baxter*, 579 F. App'x 703, 705 (11th Cir. 2014)

(citing Fed. R. Crim. P. 12(b)(3)(A)–(B)).  A defendant may challenge an indictment on a variety of grounds, including for failure to state an offense, lack of jurisdiction, double jeopardy, improper composition of the grand jury, and certain types of prosecutorial misconduct.  *United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012).  Dismissal of an indictment for governmental misconduct requires demonstration of actual prejudice to the defendant.  *United States v. Ballivian*, 819 F.2d 266, 267 (11th Cir. 1987).  Nor may dismissal be justified on the basis of deterrence absent proof that the government conduct was "truly extreme," "widespread or continuous," or where it is not curable through a lesser sanction.  *United States v. Brown*, 602 F.2d 1073, 1078 (2d Cir. 1979).  Finally, in considered the sufficiency of a criminal indictment, that is determined from its face.  *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).

## III.   ANALYSIS

Defendants move to dismiss the indictment for the following reasons: (1) a lack of subject matter jurisdiction based on the unconstitutional application of the MDLEA because their arrest occurred in the Dominican Republic's EEZ and not on the "high Seas;" (2) unreasonable, unnecessary, and unlawful delay in detainment and presentment before a court, in addition to Federal Rule of Criminal Procedure 5 violations ("Rule 5"); and (3) a lack of statutory jurisdiction because the Government failed to establish that the GFV was without nationality.  At the hearing, defense counsel agreed that the testimony of Boarding Officer Alexis Figueroa would negate Defendants' statutory jurisdiction argument, and further agreed that there was nothing to discredit his testimony.  With that concession, my recommendation that the Court deny Defendants' motion on the third basis raised is without further discussion.

### a.   The MDLEA as Applied Is Constitutional

Defendants argue that they were intercepted in the Dominican Republic's EEZ, 77 nautical miles from the coast of the Dominican Republic.  Thus, Defendants argue that they were not apprehended on the high seas, and the MDLEA cannot apply to them.  Defendants' argument makes two assumptions: (1) that "Congress's authority to punish felonies on the high seas is limited to the 'high seas' as that term is defined by customary international law," (ECF No. 16 at 5); and (2) that "the Exclusive Economic Zone is not the 'high seas' as defined by customary international law."  (*Id.* at 9).  The Government contends that United States law, not international law, controls and determines what constitutes the "high seas."  The Government further contends that the argument is precluded by Eleventh Circuit precedent.

The Constitution grants Congress the authority to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10 (the "Felonies Clause").  Pursuant to this authority, Congress passed the MDLEA, which makes drug trafficking on certain vessels in the high seas subject to the jurisdiction of the United States. *See* 46 U.S.C. § 70501 *et seq*.

The Felonies Clause only reaches felonies committed on the high seas.  *See* U.S. Const. art. I, § 8, cl. 10; *see also United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1257 (11th Cir. 2012) (noting that "Congress possesses additional constitutional authority to restrict conduct on the high seas," including the Felonies Clause).  The high seas are understood as "all waters which are neither territorial seas nor internal waters of the United States or of any foreign country."  *See United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003) (quoting 33 C.F.R. § 2.05-1).  In other words, "[o]utside the territorial sea are the high seas."  *United States v. Louisiana*, 394 U.S.

11, 23 (1969).  Territorial seas of a foreign nation generally extend up to twelve nautical miles from the coast.  *See McPhee*, 336 F.3d at 1273.

The Exclusive Economic Zone ("EEZ") was formally created and recognized in 1982 through the United Nations Convention on the Law of the Sea ("UNCLOS"), and "is an area beyond and adjacent to the territorial sea" of the subject nation, where that nation has special economic rights relating to the use, study, protection, and exploitation of natural resources.  *See* United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1280, Part V.

Defendants find support for their definition of the high seas in the Code of Federal Regulations, where it applies the UNCLOS to define jurisdiction terms:

> [u]nder customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea and without prejudice to high seas freedoms that may be exercised within exclusive economic zones pursuant to article 58 of the United Nations Convention on the Law of the Sea, and unless the context clearly requires otherwise . . . the high seas means waters that are not the exclusive economic zone (as defined in § 2.30), territorial sea (as defined in § 2.22), or internal waters of the United States or any other nation.

33 C.F.R. § 2.32(d) (emphasis added).

In response, the Government contends that EEZs are outside territorial waters and are not associated with a nation's sovereign power to proscribe crimes within their territory.  The Government argues that the Eleventh Circuit has foreclosed this argument because it has recognized that any vessel beyond the 12-mile territorial limit is "in international waters or at 'high seas.'"  (ECF No. 19 at 7) (citing *McPhee*, 336 F.3d at 1276).

Several courts in this District have considered this exact challenge and held that a nation's EEZ remains part of the high seas and does not fall within the territorial waters of that nation.  *See United States v. Pierre*, No. 21-CR-20450, 2022 WL 3042244, at *17 (S.D. Fla. Aug. 1, 2022) (the defendants were detained 112 nautical miles off the coast of the Dominican Republic); *United*

*States v. Berroa*, No. 21-20359-CR, 2022 WL 1166535, at *4 (S.D. Fla. Apr. 20, 2022) (the defendants were detained 233 nautical miles off the coast of the Dominican Republic); *United States v. Alfonso*, No. 21-20306-CR, ECF No. 47 at 5–6 & n.2 (S.D. Fla. Nov. 22, 2021).

In *McPhee*, the Eleventh Circuit affirmed a district court's finding that the defendant who was arrested onboard a stateless vessel located within international waters was subject to the jurisdiction of the United States. The Eleventh Circuit recognized the definition of "high seas" to include "all waters which are neither territorial seas nor internal waters of the United States or any foreign country." *McPhee*, 225 F.3d at 1273. The court also held that the "United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts." *Id.*

Defendants argue that *McPhee* did not answer the question presented in this case. Rather, the defendants in *McPhee* argued that the Government failed to establish the statutory jurisdictional requirement because the vessel was located within the territorial waters of the Bahamas and the Bahamian Government had not consented to the enforcement of American law by the United States in Bahamian territorial waters. (ECF No. 20 at 2) (citing *McPhee*, 336 F.3d at 1273). Because it was not raised, Defendants here argue, the Eleventh Circuit did not address whether the vessel was on the "high seas," rather, the court held that the case only required a finding that the vessel was not in territorial waters. (ECF No. 20 at 3). Even so, the Eleventh Circuit did affirm the conviction on the basis that the district court did not err in finding the vessel was in international waters, thus subject to the jurisdiction of the United States, because it was beyond 12 miles from the nearest country. The Eleventh Circuit similarly has held that the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a "nexus" to the United States. *United States v. Campbell*, 743 F.3d

802, 812 (11th Cir. 2014) ("we have repeatedly held that Congress has the power, under the Felonies Clause, to proscribe drug trafficking on the high seas."). The law of this Circuit has repeatedly held that Congress was authorized to pass the MDLEA. *See United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016); *see also United States v. Rodriguez*, 22-20080-CR, 2022 WL 3356632, at *8, 16 (S.D. Fla. Aug. 15, 2022) (relying on *McPhee* in rejecting the argument that the EEZ is not the "high Seas").

Here, Defendants' GFV was outside the 12-mile territorial boundary of the Dominican Republic when it was interdicted, thus the GFV was in international waters or on the high seas at the time. *McPhee*, 225 F.3d at 1276; *see Alfonso*, No. 21-cr-20306-CMA (holding that the defendants were on the high seas when interdicted in the Dominican Republic's exclusive economic zone and collecting cases holding that territorial waters only extend to twelve nautical miles off the coast). The "high seas" include "all waters which are neither territorial seas nor internal waters of the United States or any foreign country." *McPhee*, 225 F.3d at 1273.

As the Government noted at the hearing, no court has applied customary international law to construe the reach of the Felonies Clause. I similarly am not persuaded that international, not United States, law should determine the reach of Congress's power.

Because the Defendants were found outside the Dominican Republic's 12-mile territorial boundary, and thus, Defendants were on the high seas within the meaning of the Felonies Clause and under the MDLEA, I recommend that the Motion to Dismiss the indictment be denied on this basis.

**b. Dismissal as a Sanction for Delay in Presentment and Indictment**

Defendants argue that the Government violated Rule 5(a) of the Federal Rules of Criminal Procedure by failing to bring them before a federal magistrate judge "without unreasonable delay."

(ECF No. 16 at 11).  Defendants also argue that the Government violated Rule 5(b) by failing to secure a criminal complaint against Defendants until three weeks after Defendants' arrests, thereby infringing on Defendants' Fourth Amendment rights against unreasonable seizures and their Fifth Amendment rights to due process.  Defendants argue that the Government engaged in outrageous conduct warranting dismissal, and that the Court should exercise its inherent supervisory powers to dismiss the indictment.  Defendants suggest that dismissal is the appropriate sanction for all of the alleged violations.

*1.   Whether Defendants Were Presented Without Unreasonable Delay*

Rule 5(a)(1)(B) of the Federal Rules of Criminal Procedure provides in pertinent part, "[a] person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise."  Fed. R. Crim. P. 5(a)(1)(B). The Supreme Court has indicated that the purpose of the Rule is "to prevent oppressive police interrogations and other 'third-degree' tactics before bringing the accused in front of an officer of the court; the remedy was the exclusion of evidence which was gained during the delay by the use of such tactics."  *United States v. Cabezas-Montano*, 949 F.3d 567, 591 (11th Cir. 2020), *cert. denied sub nom. Palacios-Solis v. United States*, 207 L. Ed. 2d 1098 (2020), *and cert. denied sub nom. Guagua-Alarcon v. United States*, 208 L. Ed. 2d 398 (2020), *and cert. denied*, 208 L. Ed. 2d 398 (2020) (citing *Mallory v. United States*, 354 U.S. 449, 451-54 (1957)).

In *United States v. Purvis*, 768 F.2d 1237 (11th Cir. 1985), the Eleventh Circuit articulated various factors to be considered in determining whether a delay in presentment was unnecessary, including: (1) the distance from the point of seizure to the United States port; (2) any reason for the delay, such as exigent circumstances or emergencies that arise during the interval between the seizure and arrival in port; (3) evidence of mistreatment or improper interrogation during the delay;

and (4) the time between arrival in port and presentment to a magistrate judge. *See id.* at 1238–39. Application of the *Purvis* factors here leads me to conclude the delay was unnecessary.

For purposes of applying the *Purvis* factors, the Eleventh Circuit has, in a prior MDLEA case, treated the defendant's "arrest" as the time he was brought onboard the Coast Guard cutter. *Cabezas-Montano*, 949 F.3d at 591–29 ("Here, the timeline and location of defendant Guagua-Alarcon's <u>arrest</u> are not disputed. Guagua-Alarcon was brought onboard the Hamilton cutter on October 25, and the cutter was located 200-plus miles off the coast of Guatemala/El Salvador. On December 12, Guagua-Alarcon made his first entry into the Key West port. On December 13, he was presented for his initial appearance before a magistrate judge. There was a 49-day delay between Guagua-Alarcon's <u>arrest</u> and his presentment.") (emphasis added). Defendants Santana and Dominguez were arrested on April 20,[1] approximately 1,000 nautical miles from Miami, and first made port on May 12. There was a twenty-three-day delay between their arrest and their presentment on May 13, 2022, though the time to presentment once they arrived was fairly immediate—the next day.

The distance between arrest location and Miami was quite lengthy. Courts in this District have considered comparable trips and found it was not unreasonable to make a similar trip over a period of nine days, thus transporting them at a rate of approximately 148 nautical miles per day. *See, e.g.*, *United States v. Barros*, 21-CR-20438, 2022 WL 1135707, at *8 (S.D. Fla. Apr. 18, 2022) (finding no Rule 5(a) violation on evidence that defendants were transported 1,334 nautical

---

[1] Recall that Defendants were not brought onboard the *Wichita* until April 20, 2022, having spent the night on the GFV. Because it is of no significance to my recommendation whether April 19 or April 20 is treated as the first day of arrest, I follow the benchmark used in *Cabezas-Montano* literally and do not undertake to decide whether the Defendants here were under arrest on April 19, 2022, despite evidentiary support in the record that the USCG officers sought permission to treat them as detainees upon their determination of probable cause during the law enforcement boarding that occurred on April 19, 2022.

miles, including a diversion to seek medical treatment for one defendant, and the government advanced evidence that defendants were neither mistreated nor interrogated during transport).[2]

The journey, and resulting delay in presentment, was more than twice that found not unreasonable in *Barros*.  The only case I am aware of that involved a lengthier delay than that here was the 49-day delay reviewed for plain error in *Cabezas-Montano*.  Noting the absence of any evidentiary record developed by the trial court due to the defendant's failure to raise it below, the Eleventh Circuit held it could find no basis to conclude the error was plain.  The holding does not condone the unexplained duration of detention; indeed, in her concurring opinion, Judge Rosenbaum encouraged the United States to "give some serious consideration to its procedures for presenting an MDLEA detainee arrested in international waters." *Cabezas-Montano*, 949 F.3d at 617.  Specifically, she observed that if the government could have delivered the defendants to a closer jurisdiction in less time, Rule 5(a)(1)(B) required it to do so—regardless of the fact that 46 U.S.C. § 70504(b)(2) allows an alleged MDLEA offender to "be tried in any district." *Id.* at 614.

In considering the reason for the delay, the only explanation proffered or substantiated was a combination of convenience and custom.  As a matter of practice, USCG holds MDLEA detainees without making any effort to bring them to port for at least a period of five-to-seven days while awaiting disposition from DOJ.  Why it takes this long was unexplained.  The witnesses who were presented had no information about how disposition occurs, much less why it takes a week.  I have no basis to find that this time of delay was necessary.  Nor can I conclude that this period of delay was without consequence.  The evidence shows that the Defendants could have returned

---

[2] *See also United States v. Odom*, 526 F.2d 339, 342–43 (5th Cir. 1976) (holding that a five-day delay was reasonable for a defendant arrested on the high seas approximately 200 miles from the United States); *see also United States v. Castillo*, 899 F.3d 1208, 1217–18 (11th Cir. 2018) (discussing Rule 5(a)(1)(B) and determining that under the circumstances presented, including a delay in response from the Guatemalan government regarding jurisdiction, a 19-day delay was reasonable for a defendant arrested off of "[t]he Pacific coast of Guatemala," "approximately 1,000 miles from the port of Miami") (Martin, J., concurring), *cert. denied*, — U.S. —, 139 S. Ct. 796 (2019).

to a U.S. port earlier, without diverting any resources, but instead were transferred *off* of a vessel headed back to a U.S. port because disposition was still pending.  In fact, Defendants could have returned with any of the several vessels bound for their home ports in Puerto Rico.  Hutchinson explained that other than the *Wichita*, Defendants were detained aboard "short distance" vessels that are never more than a week out from San Juan.

After DOJ finally communicated disposition back to USCG in this case, it was still another eighteen days and five transfers to different vessels before the Defendants were presented before a magistrate judge in Miami.  While I generally credit the testimony of Officer Hutchinson, I do not defer to his characterization that USCG "makes every effort" to get detainees to a ship that can transport them to the District of prosecution.  Hutchinson assumed that each of the transfers got the Defendants closer to a ship that could get them to Miami, but his assumption was not informed by any corroborating information.  Rather, he testified candidly that the reason for the transfers is to allow the USCG to continue its law enforcement patrolling in the area.  I recognize that this is a legitimate law enforcement goal and indeed, negates the accusation in this case that the delay is intentional.  Notwithstanding, it also undermines the characterization by Hutchinson that USCG prioritizes the transportation of detainees to the United States.

Finally, to the extent the Government's insistence that the Defendants be brought by boat to the District of prosecution contributed to the delay in this case, no explanation has been advanced for me to find that it was necessary or reasonable.  The record evidence shows that Defendants could have been earlier presented in San Juan, Puerto Rico, but other than a preference for them to first appear in Miami, no reason was advanced for keeping them detained without presentation.

I turn to the last factor and find that the evidence does not show that Defendants were mistreated or improperly interrogated while detained.  However, the conditions of detention contribute to my finding that the delay was unnecessary.  The evidence here shows that Defendant Santana developed symptoms for several ailments, including irritation to his skin, eye, and other infection requiring administration of antibiotics and pain medication, approximately one week after boarding the *Wichita*.  The supervision log details each staff entry for delivering a meal to the Defendants and on some days, no more than one or two meals are logged.  On most days, Defendants were unshackled only as required for a trip to the head, or bathroom.[3]

I do not, however, find that the Defendants were mistreated.  The evidence shows that the Defendants were provided with food and water, afforded medical attention, access to a shower (every four days), and recreation as permitted by the weather.  In sum, I do not find that USCG mistreated the Defendants, but recognize, as Officer Hutchinson did, that the conditions of detention available to the USCG aboard these vessels are not appropriate for a long period of detention.

The remedy for a violation of Rule 5(a), however, is not dismissal.[4]  The Eleventh Circuit has held that "[t]he only remedy . . . recognized for a violation of Rule 5 is the suppression of evidence obtained as a result of the violation."  *United States v. Carruthers*, 458 F. App'x 811,

---

[3]  The Government suggests that the log may be incomplete and that there may have been additional meals, breaks and care than that which was recorded.  This argument tends to acknowledge that the conditions recorded were indeed inadequate.  Either way though, the log was the only evidence that was advanced and accepted at the hearing, and I have no meaningful basis to infer better treatment was afforded but not memorialized.  The only evidence presented suggests that the conditions were not more favorable than what was recorded; for example, Hutchinson explained that at least some of the vessels on which Defendants were detained, including the *Wichita*, were not equipped to hold detainees for a long period of time, yet Defendants spent at least five nights chained to the deck of that boat.

[4]  Alternatively, Defendants argue that Rule 5(b) was violated by the failure to obtain a probable cause determination by the magistrate judge within 48 hours of arrest.  Rule 5(b) stems from the Fourth Amendment's protection against unreasonable search and seizure.  Yet the Fourth Amendment "does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters."  *Cabezas-Montano*, 949 F.3d at 593.  Because Rule 5(b) is meant to protect Fourth Amendment rights and because Defendants are non-citizen aliens arrested in international waters, Rule 5(b)'s promptness requirement also does not apply to Defendants.  *See also Barros*, 2022 WL 1135707, at *8.

818 (11th Cir. 2012) (citing *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973)).  Here, Defendants' request for relief—dismissal of the indictment—would not be the appropriate relief, thus the Motion should be denied on this ground.

Though Defendants urge this Court to dismiss the indictment as a sanction for outrageous government conduct, the defense has never been recognized in the Eleventh Circuit.  "[B]ecause this Court has never actually reversed a conviction based on outrageous government conduct, any discussion of it is merely dicta."  *United States v. Cannon*, 987 F.3d 924, 942 (11th Cir. 2021), *cert. denied sub nom. Holton v. United States*, 211 L. Ed. 2d 132 (2021).  Moreover, even where the defense may exist, it must arise from government misconduct related to the defendant's underlying or charged criminal acts, as opposed to a challenge to the conditions of detention. *United States v. Jayyousi*, 657 F.3d 1085, 1112 (11th Cir. 2011).  Dismissal is not an appropriate sanction here, where Defendants challenge the government's conduct related to the delayed detention before presentment.

Defendants also argue that the Court should "use its supervisory powers" to dismiss the indictment.  Generally, "[t]he supervisory power doctrine is designed and invoked primarily to preserve the integrity of the judicial system and to prevent the federal courts from becoming accomplices to government misconduct."  *United States v. Matute*, No. 06-20596-CR, 2013 WL 6384610, at *7 (S.D. Fla. Aug. 20, 2013), *report and recommendation adopted*, No. 06-20596-CR, 2013 WL 6212170 (S.D. Fla. Nov. 27, 2013) (internal citations and quotations omitted). "Thus, supervisory authority is in essence a judicial vehicle to deter conduct and correct injustices which are neither constitutional nor statutory violations, but which the court nonetheless finds repugnant to fairness and justice and is loathe to tolerate."  *United States v. Noriega*, 746 F. Supp.

1506, 1535 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) (declining to exercise supervisory powers to remedy invasion of Panama and bringing Manuel Noriega to trial).

Defendants do not allege that there was prosecutorial misconduct in this case or that the Government committed "flagrant or repeated abuses which are outrageous or shock the conscience" in prosecuting them. *Noriega*, 746 F. Supp. at 1535–36 (internal citations and quotations omitted). To the contrary, as shown in the preceding sections, the application of the MDLEA to Defendants' drug trafficking activities in international waters was constitutional. Accordingly, Defendants have provided no cognizable basis for the Court to dismiss Defendants' indictment under its inherent supervisory powers.

### 2.   *The Speedy Trial Act Does Not Afford the Relief Sought*

At the hearing on Defendants' Motion, Defendants advanced the Speedy Trial Act as authority for the relief sought, specifically, dismissal of the indictment with prejudice. Because the facts and circumstances here would not warrant dismissal of the indictment with prejudice, I do not recommend that the Motion be granted on this alternative basis.

The Speedy Trial Act requires the United States to file an indictment or information against a defendant within thirty days from the date of his arrest. 18 U.S.C. § 3161(b). In calculating this thirty-day period, the periods of time set forth in 18 U.S.C. § 3161(h) are excludable. *United States v. Godoy*, 821 F.2d 1498, 1500 (11th Cir. 1987). The time period for the Speedy Trial Act begins to run only "after an individual is 'accused,' either by an arrest and charge or by an indictment." *United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000). Defendants argue that the time between arrest and indictment on May 26 exceeds the time permitted under the Act because the arrest occurred upon Defendants' detention aboard the Navy vessel on April 20—a difference of 36 days.

The Government defends the Speedy Trial Act challenge on the basis that the Speedy Trial clock does not begin until a Defendant is "arrested" on the charge; the Government further avers that, in MDLEA cases, "an 'arrest' occurs when a defendant is formally arrested pursuant to a criminal complaint or indictment."  (ECF No. 39 at 5) (citing *Delgado-Pachay v. United States*, 8:20-CV-154-T-02JSS, 2020 WL 1820506, at \*4 (M.D. Fla. Apr. 10, 2020)).  The Government resists characterizing Defendants' period of detention with the USCG as following an arrest, at least for purposes of the Speedy Trial Act.[5]

The Eleventh Circuit has previously rejected the argument that the Speedy Trial Act clock begins to run at the time of arrest if it is not accompanied by the formal institution of federal charges.  *United States v. Kubiak*, 704 F.2d 1545, 1548 (11th Cir. 1983).  That the arrest is effectuated by federal law enforcement officers is not enough to trigger the Act.  *See id.* ("The record in this case reveals that although the appellants were initially arrested by federal authorities, they were never taken before a federal magistrate; nor were federal charges ever lodged against the appellants in a complaint.").

The Eleventh Circuit's holding in *Kubiak* applies a panel decision filed earlier that year in which the Court was called upon to define "arrest" for purposes of the Speedy Trial Act.  *United States v. Sayers*, 698 F.2d 1128, 1130 (11th Cir. 1983).  The Court there began with the observation that while the Speedy Trial Act was enacted to ensure the speedy trial guarantee conveyed by the Sixth Amendment, the rights bestowed by the Act are a function of statute and thus defining its use of "arrest" was a matter of statutory construction.  *Id*. at 1130–31.  The Eleventh Circuit concluded and held that "the statutory scheme establishes Congressional intent that the time period

---

[5]  The Eleventh Circuit has, for purposes of measuring the delay in presentment, used the date on which the defendant boarded the USCG vessel under detention as the date of his arrest.  *Cabezas-Montano*, 949 F.3d at 591–92.

for the Speedy Trial Act should begin to run only after an individual is 'accused,' either by an arrest and charge or by an indictment." *Id.* at 1131.

In affirming the trial court's conclusion, the Eleventh Circuit quoted from the record and the trial court's explanation that:

> the notion of the Speedy Trial Act is, that once the Government has made a charge and has placed a restraint upon a defendant, either physically or legally, by releasing him on bail or by filing a formal complaint, that it then takes on an obligation to proceed expeditiously to either process that charge or have it dismissed, and that when that hasn't occurred—that is to say, when there has been no release on bail or no formal complaint—then there is nothing which the Act would logically have an interest in speeding along.

*Id.* at 1131. Defendants highlight the trial court's recognition that a restraint may be physical or legal, which other courts have found sufficient to satisfy an "arrest" within the meaning of the Act.[6] *See United States v. Vasquez-Escobar*, 30 F. Supp. 2d 1364, 1368 (M.D. Fla. 1998) (quoting the above language and concluding therefrom that "the *Sayers* Court implied that such continuous detention would implicate the Act").

With respect to the district courts that have reached a different conclusion, I disagree that *Sayers* may be distinguished here on the basis that the detention was not continuous, because the Eleventh Circuit did not in its analysis rely on the fact that the defendant was released pending the charges. Nor has the Eleventh Circuit, in subsequent opinions applying *Sayers*, relied on the fact of his intervening release from custody as a factor contributing to the Court's holding that the Act is triggered only after a defendant is formally accused on federal charges. *See, e.g.*, *United States v. Keel*, 254 F. App'x 759, 761 (11th Cir. 2007) (rejecting Speedy Trial Act argument arising from arrest for violation of supervised release condition and subsequent indictment, two years later, for the same conduct); *United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000) (holding that civil

---

[6] As a factual matter, specific to this case, the evidence presented demonstrates that beginning April 19, 2022, Defendants were held in continuous physical detention for the purposes of criminal prosecution in connection with these charges.

detention of alien awaiting deportation did not implicate Speedy Trial Act and finding clock did not begin to run until return of indictment for illegal reentry after deportation);[7] *Kubiak*, 704 F.2d at 1548 (applying *Sayers* and concluding Speedy Trial Act was not triggered by initial arrest because "although the appellants were initially arrested by federal authorities, they were never taken before a federal magistrate; nor were federal charges ever lodged against the appellants in a complaint").

If the opposite conclusion were reached, and the detention without formal charges were treated here as an arrest for purposes of the Speedy Trial Act, the violation would require dismissal of the indictment, but the analysis does not end there. The Court has discretion to dismiss the complaint with or without prejudice and the Eleventh Circuit does not perceive a preference for either form of dismissal. *United States v. Derose*, 74 F.3d 1177, 1182 (11th Cir. 1996); *United States v. Miranda*, 835 F.2d 830, 834 (11th Cir. 1988). The Court must consider (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of reprosecution on the administration of the Act and the administration of justice. 18 U.S.C. § 3162(a)(1). The Court is required to analyze all three factors. *See United States v. Russo*, 741 F.2d 1264, 1267 (11th Cir. 1984).

The Court recognizes that the crime charged is serious. Indeed, they are extremely serious offenses which carry a mandatory minimum sentence of 10 years of imprisonment and a statutory maximum of life imprisonment. 21 U.S.C. § 960(b)(1)(B). A significant amount of cocaine was collected during the interdiction (seven packages totaling 210 kilograms of cocaine). The Court recognizes that "Congress enacted the MDLEA because drug trafficking aboard vessels (1) 'is a

---

[7]  The Court in *Noel* recognized, but did not apply, an exception to the rule that civil detention does not trigger the Speedy Trial Act that may arise when the detention is a mere ruse to detain a defendant for later criminal prosecution. *Noel*, 231 F.3d at 836. The mere ruse exception has not been raised here. Indeed, no other grounds for detaining the Defendants were advanced by the Government for the Court to question as a mere ruse.

serious international problem and is universally condemned,' and (2) 'presents a specific threat to the security and societal well-being of the United States.'" *United States v. Rendon*, 354 F.3d 1320, 1325 n.2 (11th Cir. 2003) (quoting 46 U.S.C. app. § 1902). The seriousness of these drug trafficking offenses mitigates against dismissal with prejudice.

Where the crime charged is serious, the court should dismiss only for a correspondingly severe delay. *See Russo*, 741 F.2d at 1267. The delay in bringing the indictment—six days—is significant. Notwithstanding, and proportional to the seriousness of the offense, I cannot agree that the delay is so severe as to weigh in favor of dismissal with prejudice.

Finally, the third factor, I find, is neutral for the reasons explained by the Eleventh Circuit in *Russo*:

> The government urges that reprosecution would further the public's interest in justice in light of the serious nature of drug offenses and the public's interest in bringing such offenders to trial. Conversely, dismissal without prejudice can be viewed as frustrating the Act's mandate of swift prosecution since it would open the way to retrial after an even longer delay. Because these two competing interests fairly balance out, this factor cannot be said to weigh heavily on the side of dismissal with or without prejudice.

*Russo*, 741 F.2d at 1267. Ultimately, it is my recommendation that, even if the Court concludes that the Defendants' arrest on April 20[8] triggered the Speedy Trial Act, the six-day delay in the return of the indictment would not warrant the relief sought in the Motion, that is, dismissal of the indictment with prejudice. Accordingly, I recommend that the Court deny the Motion on that basis.

---

[8] Defendants argue alternatively that the Speedy Trial Act clock was triggered no later than April 25, when the DOJ communicated its disposition to USCG and specifically, that the U.S. Attorney's Office in Miami would accept prosecution in this case. Under controlling Eleventh Circuit law, the prosecutor's indication that she would file charges would not trigger the Act until she does in fact bring the charges. Again though, if my application of *Sayers* and subsequent cases is wrong and the clock was triggered by this date, my recommendation that dismissal be without prejudice would be with equal force from this date, which implicates a delay of one day.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' Joint Motion to Dismiss Indictment be **DENIED**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable K. Michael Moore, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, this 19th day of October, 2022.

_____
LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE

cc:    Honorable K. Michael Moore
       Counsel of Record