UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:22-cr-20220-KMM

UNITED STATES OF AMERICA

v.

PEDRO ROSARIO SANTANA and
FRANKLIN DOMINGUEZ,

    Defendants.
_____/

## ORDER ON REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendants Pedro Rosario Santana and Franklin Dominguez's Joint Motion to Dismiss Indictment. ("Mot.") (ECF No. 16). The Government filed a response to the Motion on August 12, 2022, ("Resp.") (ECF No. 27), and Defendants filed a joint Reply (ECF No. 20). The matter was referred to the Honorable Lauren F. Louis, United States Magistrate Judge, who conducted an evidentiary hearing on September 16, 2022, *see* (ECF Nos. 40, 64). On October 19, 2022, Magistrate Judge Louis issued a Report and Recommendation ("R&R") (ECF No. 51), recommending that the Motion be DENIED. *Id.* at 24. Defendants timely filed objections to the R&R ("Defs.' Obj.") (ECF No. 54)[1], as did the Government ("Gov.'s Obj.") (ECF No. 55). Both Defendants and the Government filed replies. *See* (ECF Nos. 58–59). The matter is now ripe for review. As set forth below, the Court ADOPTS IN PART the R&R.

---

[1] Defendant Dominguez moves separately to adopt Defendant Santana's Objections as his own. *See* (ECF No. 56). That Motion is GRANTED. As such, throughout the remainder of this Order, the Court refers to Defendants' Objections (ECF No. 54) as jointly lodged by both Defendants.

I.  **FACTUAL BACKGROUND**[2]

On April 19, 2022, marine patrol officers approached a "go-fast vessel" ("GFV"), adrift and covered by tarp, in a known drug trafficking route seventy-seven miles off the coast of the Dominican Republic. At the time of interdiction, officers saw several packages floating around the vessel, which field tests later revealed to contain a total of 210 kilograms of cocaine.

U.S. Customs and Border Protection Officer Alexis Figueroa conducted the right of visit to Defendants' vessel. After boarding, Officer Figueroa[3] asked Defendants, both collectively and individually, if there was a master of the vessel—both Defendants denied the title. Because Defendants' GFV had no physical indicia of nationality, Officer Figueroa then asked Defendants, collectively and individually, if they wanted to make a claim of nationality. Defendants again declined. Officer Figueroa relayed Defendants' answers back to his team leader, who then communicated the information to an unspecified individual in the United States Government. That individual instructed the officers at the scene to treat the vessel as one without nationality.

After spending the night of April 19 on their GFV, Defendants were detained aboard the *USS Wichita*—a U.S. Navy vessel on patrol in the Caribbean—on April 20. From April 20 through May 12, Defendants were transferred from vessel to vessel, boarding nine in total, before arriving in Miami for presentment. Defendants' transfers were intended to allow the U.S. government vessels to continue operating in their respective patrol areas (as opposed to heading for port due solely to Defendants' presence). Defendants' treatment, in turn, seems to have varied from vessel

---

[2] The uncontested facts contained herein are variously taken from the Complaint filed in this matter ("Compl.") (ECF No. 1), the R&R, and the transcript of the evidentiary hearing held on September 16, 2022 (ECF No. 64) (hereinafter "Evid. Hr'g").

[3] Officer Figueroa is a certified linguist for the Coast Guard and, speaking Spanish, ascertained Defendants' ability to understand him during his questioning. *See* Evid. Hr'g at 114.

2

to vessel and is discussed more thoroughly below where applicable. At the September 16 evidentiary hearing, Coast Guard Lieutenant Peter Hutchison explained that it is standard practice to keep detainees aboard Coast Guard vessels, outside United States territorial waters, until the Coast Guard receives "disposition" from the Department of Justice (i.e., a determination of where the case will be prosecuted).

On April 25, the Coast Guard received disposition indicating that the U.S. Attorney's Office for the Southern District of Florida in Miami would accept prosecution. From there, as explained by Hutchison at the evidentiary hearing, the Coast Guard would make efforts to get Defendants aboard a ship which could transfer them to this District. Defendants ultimately arrived in Miami for presentment on May 12.

## II.     LEGAL STANDARD

The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The Court "must consider *de novo* any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). A *de novo* review is therefore required if a party files "a proper, specific objection" to a factual finding contained in the report. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006). "It is critical that the objection be sufficiently specific and not a general objection to the report" to warrant *de novo* review. *Id.*

Yet a party's objections are improper if they expand upon and reframe arguments already made and considered by the magistrate judge, or simply disagree with the magistrate judge's conclusions. *See Melillo v. United States*, No. 17-CV-80489, 2018 WL 4258355, at *1 (S.D. Fla. Sept. 6, 2018); *see also Marlite, Inc. v. Eckenrod*, No. 10-23641-CIV, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) ("It is improper for an objecting party to . . . submit [ ] papers to a district

court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.") (quoting *Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)). When the objecting party has not properly objected to the magistrate judge's findings, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *See Keaton v. United States*, No. 14-21230-CIV, 2015 WL 12780912, at *1 (S.D. Fla. May 4, 2015); *see also Lopez v. Berryhill*, No. 17-CV-24263, 2019 WL 2254704, at *2 (S.D. Fla. Feb. 26, 2019) (stating that a district judge "evaluate[s] portions of the R & R not objected to under a clearly erroneous standard of review" (citing *Davis v. Apfel*, 93 F. Supp. 2d 1313, 1317 (M.D. Fla. 2000))).

### III. DISCUSSION

In the R&R, Magistrate Judge Louis recommends that the Court deny Defendants' Motion based on two conclusions: (1) this Court has subject-matter jurisdiction over the action, as the Maritime Drug Law Enforcement Act, 46 U.S.C. § 70503(a)(1) & 70506(b) ("MDLEA") was constitutionally applied to Defendants where they were arrested in the Exclusive Economic Zone of the Dominican Republic (the "EEZ"), *see* R&R at 9–12; and (2) while Defendants may have suffered an unnecessary delay between their arrest and presentment, *see id.* at 12–19, dismissal of the indictment with prejudice is not a proper sanction for the alleged violations under Federal Rule of Criminal Procedure 5(a), *see id.* at 17–18, the Speedy Trial Act, *id.* at 19–23, or through the Court's inherent supervisory powers, *id.* at 18–19.[4] Defendants raise more than a dozen objections

---

[4] In the Motion, Defendants also argued that the indictment should be dismissed because the Government failed to establish statutory jurisdiction pursuant to 46 U.S.C. § 70502(d)(1). *See* Mot. at 14–16. At the September 16 evidentiary hearing, however, defense counsel agreed that the testimony of Officer Figueroa negated this argument. *See* Evid. Hr'g at 152–53. Accordingly, Magistrate Judge Louis recommended that the Court deny Defendants' Motion on this basis.

to these conclusions, *see generally* Defs.' Obj., and the Government raises its own objection, *see* Gov.'s Obj. at 1. The Court addresses the objections in the order of their occurrence in the R&R.

### A. THE EEZ IS WITHIN THE "HIGH SEAS" UNDER THE FELONIES CLAUSE.

Because neither Party suggested otherwise, the Court assumes the only source of jurisdiction underlying the MDLEA's application in this case is the Felonies Clause.[5] That clause grants Congress the power "[t]o define and punish . . . Felonies committed on the high Seas." U.S. Const. art. I, § 8, cl. 10. The Eleventh Circuit has repeatedly upheld Congress's enactment of the MDLEA under the Felonies Clause and, correspondingly, the MDLEA's jurisdiction over the "high seas." *See, e.g.*, *Estupinan*, 453 F.3d at 1338–39; *United States v. Rendon*, 354 F.3d 1320, 1325 (11th Cir. 2003) ("[B]y enacting [the MDLEA], Congress exercised its established authority 'to regulate drug-related activities on the high seas.'" (quoting *United States v. Tinoco*, 304 F.3d 1088, 1110 n.21 (11th Cir. 2002)).

Defendants' Motion posits that the EEZ does not fall within the high seas (rendering the MDLEA an inapplicable source of jurisdiction). Yet this argument is definitionally foreclosed by the Eleventh Circuit's holding in *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003). First, "[t]he United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts." *Id.* (citations omitted). Second, the high seas include "all waters which are neither territorial seas nor internal waters of the United States or of any foreign country." *Id.* (citing 33 C.F.R. § 2.05-1). Thus, under *McPhee*, the high seas begin twelve nautical miles from a foreign coast (i.e., where a foreign nation's territorial seas end),

---

R&R at 8. Because Defendants did not object to this conclusion, the Court ADOPTS Magistrate Judge Louis's determination with respect to statutory jurisdiction without further discussion.

[5] This conclusion is supported by Eleventh Circuit precedent. *See United States v. Estupinan*, 453 F.3d 1336, 1338–39 (11th Cir. 2006) (collecting cases).

5

regardless of the EEZ's boundaries. *See id.*; *accord United States v. Pierre*, 21-CR-20450, 2022 WL 3042244 (S.D. Fla. Aug. 1, 2022) ("The EEZ, after all, *is* part of the 'high seas.'") (internal citations omitted).

Defendants ask this Court to redefine the high seas according to customary international law. *See, e.g.*, Mot. at 5; Defs.' Obj. at 17–20. Yet the R&R expressly considered and rejected this suggestion. Relying on *United States v. McPhee*, Magistrate Judge Louis correctly concluded a foreign EEZ falls within the "high seas" under Eleventh Circuit precedent. *See* R&R at 9–10 (citing 336 F.3d at 1273). Magistrate Judge Louis then described at length why the "high seas" must be understood with reference to United States law. First, she catalogued cases in this district that have rejected similar, if not identical, challenges to the MDLEA's application on the same basis. *See* R&R at 10–11 (citing *United States v. Pierre*, No. 21-cr-20450, 2022 WL 3042244, at *17 (S.D. Fla. Aug. 1, 2022); *United States v. Berroa*, No. 21-cr-20359, 2022 WL 1166535 (S.D. Fla. Apr. 20, 2022); *United States v. Alfonso*, 21-cr-20306, ECF No. 47 at 5–6 & n.2 (S.D. Fla. Nov. 22, 2021)).[6] Magistrate Judge Louis determined that, even if the Eleventh Circuit itself has not expressly held that a foreign EEZ should be considered part of the high seas, the Eleventh Circuit has effectively done so in its affirmation of *McPhee*. *See* R&R at 11–12 (citing *McPhee*, 336 F.3d at 1273). Magistrate Judge Louis ultimately determined that a foreign EEZ falls within the "high seas" for purposes of MDLEA jurisdiction pursuant to Eleventh Circuit precedent regarding the Felonies Clause. *See* R&R at 12.

---

[6] That the R&R would recommend that this Court construe the Felonies Clause with reference to United States—rather than international—law should not be surprising given this district's thorough and well-reasoned discussions in *United States v. Pierre*, No. 21-cr-20450, 2022 WL 3042244, at *17–19 (S.D. Fla. Aug. 1, 2022) and *United States v. Rodriguez*, 22-20080-CR, 2022 WL 3356632, at *16–18 (S.D. Fla. Aug. 15, 2022). In those cases, the Court rejected two iterations of the same challenge Defendants present here (i.e., that interdiction in another nation's EEZ exceeds the MDLEA's jurisdiction as defined by customary international law).

While Defendants purport to raise four objections to the R&R's conclusions here, their arguments boil down to a common core: Defendants believe the reach of the Felonies Clause should be limited by customary international law. *See* R&R at 9–12; Defs.' Obj. at 17–20. Each objection is discussed below.

   1. *The EEZ is not the 'high seas' under customary international law.*

First, Defendants dispute that their vessel was on the "high seas" at the time it was interdicted because "[t]he vessel was located in the Dominican Republic's [EEZ], which is not considered international waters or the 'high seas' under international law." Defs.' Obj. at 17. This objection raises the same jurisdictional argument put before Judge Louis in Defendants' Motion—namely that the Felonies Clause must be understood through reference to international law. *See* Mot. at 5–11. Defendants' objection offers no additional case law in support of their position. *See* Defs.' Obj. at 17. As discussed above, Magistrate Judge Louis adequately considered and rejected the argument that customary international law should limit the reach of the Felonies Clause, and Defendants offer nothing new to call into question her analysis. Defendants' objection is thus a "rehashing of the same arguments" and does not merit reconsideration simply because Defendants disagree with Magistrate Judge Louis's conclusions. *Marlite, Inc.*, 2012 WL 3614212, at *2.

   2. *Defendants' reliance on the C.F.R. as opposed to customary international law.*

Next, Defendants object "to the suggestion that [they are] relying on the C.F.R. for [their] argument that the EEZ does not include the high Seas under international law." Defs.' Obj. at 17. Even if, as the objection suggests, Magistrate Judge Louis characterized Defendants' position as

wholly deriving from the Code of Federal Regulations,[7] Defendants raise no new arguments for the Court to consider. In explaining that their position derives "from the 1982 United Nations Convention on the Law of the Seas," Defs.' Obj. at 17, Defendants simply ask the Court once more to define the high seas according to international law. The Court once more declines to do so.

        3. *The Eleventh Circuit's holdings regarding the EEZ as a part of the high seas.*

Defendants then object "to the conclusion that the Eleventh Circuit has rejected [the] argument" that the "EEZ is explicitly no longer treated as part of the high seas." *Id.* at 18 (internal citations omitted). Yet nowhere does the R&R conclude the Eleventh Circuit has rejected such a notion. *See* R&R at 9–12. The R&R instead properly defines the high seas, according to Eleventh Circuit precedent, as "all waters which are neither territorial seas nor internal waters of the United States or any foreign country," and thereafter explicitly acknowledges that the Eleventh Circuit's holdings offer collateral—rather than direct—support for that reading.[8] To the extent this objection finds fault with something the R&R did not do, it is overruled.[9]

---

[7] She did not. *See* R&R at 10 ("Defendants *find support* for their definition of the high seas in the Code of Federal Regulations, where it applies the [United Nations Convention on the Law of the Sea] to define jurisdiction terms.") (emphasis added).

[8] *Id.* at 11 ("Defendants here argue, the Eleventh Circuit did not address whether the vessel was on the 'high seas,' rather, the court held that the case only required a finding that the vessel was not in territorial waters. Even so, the Eleventh Circuit did affirm the conviction on the basis that the district court did not err in finding the vessel was in international waters, thus subject to the jurisdiction of the United States, because it was beyond 12 miles from the nearest country.").

[9] The Court speculates that this objection mistakenly stems from a string citation on page 12 of the R&R, in which Magistrate Judge Louis characterizes *Rodriguez*, 2022 WL 3356632, at *8, 16 (S.D. Fla. Aug. 15, 2022) as "relying on *McPhee* in rejecting the argument that the EEZ is not the 'high Seas.'" R&R at 12. The similarity of this language to the objection, in a citation immediately following discussion of and citation to Eleventh Circuit precedent, leads the Court to believe this particular objection was made in error.

*4. Other courts have applied customary international law to construe the reach of the Felonies Clause.*

In their final objection to jurisdiction, Defendants attack the proposition that "no court has applied customary international law to construe the reach of the Felonies Clause." Defs.' Obj. at 18 (citing R&R at 12). To do so, Defendants cite a centuries-old statutory construction case dealing with the Piracy Clause, *see* Defs.' Obj. at 19 (citing *United States v. Furlong*, 18 U.S. 184, 196 (1820)), as well as *United States v. Bellaizac-Hurtado*, 700 F.3d 1245 (11th Cir. 2012), as well as a case construing the Offences Clause, for the proposition that the Felonies Clause should be limited by customary international law. *See* Defs.' Obj. at 20. As a threshold matter, neither of these cases do what Defendants claim they do (i.e., "appl[y] customary international law to construe the reach of the Felonies Clause"), as neither case renders a holding with respect to the Felonies Clause.[10] Yet on deeper level, the Court disagrees with the supposition that, simply because one clause in the Constitution references international law, the clause adjacent to it must be limited by international law as well. As Justice Gorsuch explains in his concurring opinion in *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1416 (2018), the Framers were intentionally selective when incorporating international law into the Constitution:

> While this Court has called international law "part of our law,", and a component of the "law of the land," that simply meant international law was no different than the law of torts or contracts— it was "part of the so-called general common law," but not part of federal law. The text of the Constitution appears to recognize just this distinction. Article I speaks of "Offences against the Law of Nations," while both Article III and Article VI's Supremacy Clause, which defines the scope of pre-emptive federal law, omit that phrase

---

[10] In fact, *Bellaizac-Hurtado* differentiates the scope of the Felonies Clause from the limitations textually inherent in the Offences Clause. *See* 700 F.3d 1245, 1247 (11th Cir. 2012) ("Congress possesses additional constitutional authority to restrict conduct on the high seas, including the Piracies Clause; the Felonies Clause; and the admiralty power.") (internal citations omitted).

> while referring to the "Laws of the United States." Congress may act to bring provisions of international law into federal law, but they cannot find their way there on their own. The law of nations is not embodied in any provision of the Constitution, nor in any treaty, act of Congress, or any authority, or commission derived from the United States.

*Id.* (internal citations omitted). The Court is equally convinced here that the Felonies Clause, unlike its adjacent Offences Clause, does not "link the outer reaches of Congress's power to the vagaries of international sentiment." *See Pierre*, 2022 WL 3042244, at *14. In sum, the Court declines to read "the Law of Nations" into the Felonies Clause where that phrase is absent from the Constitutional text.

The Court therefore overrules each of Defendants' four objections pertaining to the jurisdictional reach of the MDLEA via the Felonies clause.

## B. DISMISSAL OF THE INDICTMENT WITH PREJUDICE IS NOT A PROPER REMEDY FOR THE ALLEGED VIOLATIONS OF RULE 5, THE SPEEDY TRIAL ACT, OR THROUGH THE COURT'S SUPERVISORY POWERS.

The balance of Defendants' objections pertains to Magistrate Judge Louis's conclusion that dismissal of the indictment is not a proper remedy for any violations under the theories advanced by Defendants. *See* Defs.' Obj. at 1–17. The Court assesses each of Defendants' theories in turn.

### 1. *Federal Rule of Criminal Procedure 5.*

Defendants object to Magistrate Judge Louis's determination that their delay in presentment before a magistrate judge, though unnecessary,[11] does not merit dismissal of the indictment under Rule 5(a). Federal Rule of Criminal Procedure 5(a)(1)(B) requires "[a] person

---

[11] Defendants object to the R&R's framing of the question as presentment without "unreasonable" (as opposed to "unnecessary") delay. The objection is technically correct according to the language of Rule 5(a). Thus, the Court adopts the R&R's heading on page 13 with the exception of the word "unreasonable," and substitutes in its place the word "unnecessary."

making an arrest outside the United States [to] take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." *Id.* In *United States v. Purvis*, the Eleventh Circuit outlined four factors that a Court should assess when a defendant challenges the delay between his arrest and presentment under Rule 5(a)(1)(B) as unnecessary. 768 F.2d 1237, 1238–39 (11th Cir. 1985); *see also Cabezas-Montano*, 949 F.3d at 591–94 (applying *Purvis* factors to an unnecessary delay challenge under the MDLEA). These factors include "(1) the distance between the location of the defendant's arrest in international waters and the U.S. port he was brought to; (2) the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge; (3) any evidence of mistreatment or improper interrogation during the delay; and (4) any reason for the delay, like exigent circumstances or emergencies." *Cabezas-Montano*, 949 F.3d at 591 (citing *Purvis*, 768 F.2d at 1238–39).

Although Defendants lodge several objections to Magistrate Judge Louis's *Purvis* analysis, the Court need not reach those issues where "[t]he remedy for a violation of Rule 5(a) . . . is not dismissal." *See* R&R at 17. As the law stands in this circuit, the only recognized remedy for a Rule 5(a) violation is a determination that evidence obtained as a result is *per se* inadmissible. *See United States v. Mendoza,* 473 F.2d 697, 702 (5th Cir. 1973)[12] ("A violation of [Rule 5(a)] renders the evidence obtained *per se* inadmissible."); *Purvis*, 768 F.2d at 1238 ("We need not decide whether dismissal of the indictments would be an appropriate remedy if there had been an 'unreasonable delay' within the meaning of Rule 5(a)."); *Cabezas-Montano*, 949 F.3d at 591 (listing cases in which the remedy for Rule 5(a) presentment violations was the exclusion of evidence). The Court heeds the Eleventh Circuit's cautious jurisprudence and adopts the R&R to

---

[12] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

11

the extent Magistrate Judge Louis found dismissal of the indictment to be an improper remedy under Rule 5(a). The Court therefore does not reach the thornier question of whether Rule 5(a) was violated here because, even if the Rule were violated, the Court could not afford Defendants the remedy they seek.

Defendants raise two objections to this conclusion as contained in the R&R. First, they object to Magistrate Judge Louis's citation to the unpublished decision of *United States v. Carruthers*, 458 F. App'x 811 (11th Cir. 2012) because the decision is "not considered binding precedent" in the Eleventh Circuit. *See* Defs.' Obj. at 6.[13] This objection is without merit, as the unpublished *Carruthers* is bolstered by the published conclusions of *Mendoza,* 473 F.2d at 702, *Purvis*, 768 F.2d at 1238, and *Cabezas-Montano*, 949 F.3d at 591, each of which demonstrates that the Eleventh Circuit has not recognized dismissal of an indictment as a remedy for Rule 5(a) violations.[14] And Defendants' second objection, that "there is no reason suppression of statements should be the exclusive remedy," fails to sufficiently recognize those binding decisions. Again, the Court declines to wade into the murky pool of redefining rights and remedies as afforded by Rule 5(a) and instead chooses the more stable path of leaving the law where it stands.

---

[13] Yet Defendants immediately thereafter provide the Court with two cases *outside of the Eleventh Circuit* for the proposition that dismissal is an appropriate remedy under Rule 5(a). *Id.* at 7 (citing *United States v. Osunde*, 638 F. Supp. 171 (N.D. Cal. 1986) and *United States v. Contreras*, 197 F. Supp. 2d 1173 (N.D. Iowa 2002)). Defendants fail to convince the Court why it should reject the persuasive reasoning of the Eleventh Circuit in favor of much older—and non-binding—authority from elsewhere.

[14] Other unpublished opinions within the Eleventh Circuit support this conclusion as well. *See, e.g.*, *United States v. Bibb*, 194 F. App'x 619, 623 (11th Cir. 2006) ("[W]e have never recognized dismissal of the indictment as a proper remedy for a Rule 5 violation."); *United States v. Epieyu*, No. 22-20014-CR, 2022 WL 2908019, at *6 (S.D. Fla. July 5, 2022), *report and recommendation adopted*, No. 1:22-CR-20014, 2022 WL 2904669 (S.D. Fla. July 22, 2022) (recognizing the appropriate remedy for a Rule 5 violation is suppression of the evidence, not dismissal of the indictment); *Barros*, 2022 WL 1135707, at *9 (noting that defendants are not entitled to dismissal of the indictment for a Rule 5 violation).

The Court also adopts the R&R's conclusion that Rule 5(b) is inapplicable here. Federal Rule of Criminal Procedure 5(b) states that, where "a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must promptly be filed in the district where the offense was allegedly committed." Fed. R. Crim. P. 5(b). Yet this rule, which comes from the Fourth Amendment's protection against unreasonable searches and seizures, "does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country." *Cabezas-Montano*, 949 F.3d at 593; *accord Barros*, 2022 WL 1135707, at *8; *United States v. Garcia*, 8:21-CR-0041-TPB, 2022 WL 4386795, at *2 (M.D. Fla. Sept. 22, 2022). Defendants argue that "[t]here is no reason to believe that Rule 5(b) . . . would not apply to defendants who were arrested outside the United States." Defs.' Obj. at 8. This argument flouts the Fourth Amendment holding of *Cabezas-Montano*. While the Court recognizes that case did not specifically mention Rule 5(b), Defendants do not deny Rule 5(b) emanates from the Fourth Amendment's protections, nor do they attempt to argue that the Fourth Amendment is applicable here. This objection is therefore overruled.

2. *Speedy Trial Act*

Defendants also make several objections to Magistrate Judge Louis's conclusions regarding the Speedy Trial Act. This statute requires an indictment to be filed within thirty days from the date an individual "was arrested or served with a summons in connection with such charges" as alleged in the indictment. 18 U.S.C. § 3161(b). While designed to effectuate a defendant's Sixth Amendment guarantees, the Speedy Trial Act is a statute subject to its own interpretations separate and distinct from Sixth Amendment jurisprudence. *United States v. Sayers*, 698 F.2d 1128, 1130–31 (11th Cir. 1983). It follows that the Act's definition of "arrest" is a question of statutory interpretation. *Id.* Accordingly, the Eleventh Circuit has repeatedly

determined over the past forty years that, for purposes of the Speedy Trial Act, an "arrest" occurs when an individual is "formally charged with an offense." *See, e.g.*, *id.* at 1131; *United States v. Kubiak*, 704 F.2d 1545, 1548 (11th Cir. 1983) (affirming denial of motion to dismiss indictment where defendants "were never taken before a federal magistrate; nor were federal charges ever lodged against the appellants in a complaint"); *United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000) ("[T]he time period for the Speedy Trial Act should begin to run only after an individual is 'accused,' either by an arrest and charge or by an indictment."); *United States v. Keel*, 254 F. App'x 759, 761 (11th Cir. 2007) (noting that the Act "only applies to an individual who has been formally charged with an offense").

As an initial matter, Defendants incorrectly argue that Magistrate Judge Louis concluded they were "arrested" under the Speedy Trial Act on a specific date. *See* Defs.' Obj. at 9. Magistrate Judge Louis instead found that, because dismissal of the indictment with prejudice would not be warranted even if the Speedy Trial Act was violated, she need not decide the exact date Defendants were arrested under the statute. *See* R&R at 21–23 (making no finding specific to the arrest date and stating that, "even if the Court concludes that the Defendants' arrest on April 20 triggered the Speedy Trial Act, the six-day delay in the return of the indictment would not warrant the relief sought in the Motion" because dismissal with prejudice would be improper).

Regardless, this Court takes the more direct route of concluding Defendants were "arrested," at least for purposes of the Speedy Trial Act, on May 13, 2022 (the date on which they were formally charged in the Southern District of Florida). As made clear by the Eleventh Circuit in *Sayers*, a defendant's arrest under the Act occurs when he is charged with an offense. *See, Sayers,* 698 F.2d at 1131; *accord Kubiak*, 704 F.2d at 1548; *Noel*, 231 F.3d at 836; *Keel*, 254 F. App'x at 761. And while Defendants attempt to distinguish those cases, they point to no Eleventh

Circuit case holding that arrest may occur at a time other than the date of charging in the context of a Speedy Trial challenge to an MDLEA interdiction. *See* Defs.' Obj. at 9–13.[15] The Court therefore holds that Defendants were arrested for Speedy Trial Act purposes on May 13 and, because their indictment was entered on May 27 (a gap of fourteen days), the Act was not violated.

### 3. Supervisory Powers

Finally, Defendants argue their indictment should be dismissed as an exercise of the Court's inherent supervisory powers.[16] This doctrine "permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar." *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (quoting *McNabb v. United States*, 318 U.S. 332, 340 (1943)). The doctrine was "designed and [is] invoked primarily to preserve the integrity of the judicial system and to prevent the federal courts from becoming accomplices to governmental misconduct." *United States v. Noriega*, 746 F. Supp. 1506, 1535 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) (internal citations omitted). Yet an "invocation of supervisory power to dismiss an indictment is a harsh remedy, [and] it is reserved only for flagrant or repeated abuses which are outrageous or shock the conscience." *Id.* As such, the use of supervisory powers to dismiss an indictment is improper where "applied as a remedy for mere technical illegalities or inadvertent

---

[15] Defendants argue *United States v. Noel* supports their position in that the *Noel* Court found the date of arrest under the Act might change "when detentions are used by the government, not to effectuate deportation, but rather as 'mere ruses to detain a defendant for later criminal prosecution.'" 231 F.3d at 836; *see* Defs.' Obj. at 12–13. Yet this exception seems to have only been applied to immigration detentions incident to deportation, *see Noel*, 231 F.3d at 836 (collecting cases). And as Defendants repeatedly suggest in their objections, "[a] decision can hold nothing beyond the facts of that case." R&R at 9 (citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010)). This objection is therefore overruled.

[16] This argument appears to have been raised for the first time in supplemental briefings following the September 16 evidentiary hearing. *See* (ECF No. 38) at 2–3 (arguing the indictment should be dismissed under the "outrageous conduct doctrine" and through a district court's inherent supervisory powers).

violations . . . . [A] higher threshold of government misconduct is imposed for invocation of the supervisory power than that required to state a constitutional or statutory violation." *See id.*

In their Objections, Defendants argue that the Government's conduct in this case constitutes "flagrant or repeated abuses which are outrageous or shock the conscience," and that their "conditions of confinement approached the level of human rights violations." Defs.' Obj. at 16. The Court does not deny that Defendants' conditions of confinement were unpleasant. As the R&R recognizes, Defendants were at times "confined on the deck of the ship and . . . exposed to the elements, including sea water spray"; Defendant Santana "developed symptoms for several ailments" during his confinement; and the record suggests Defendants may have been unshackled only to use the bathroom. *See* R&R at 6, 17. These conditions were exacerbated by the length of time in which Defendants experienced them—variously from April 19, when their GFV was interdicted, until May 12, when Defendants arrived in this district. *See id.* at 1–2.

The Court does not agree, however, that Defendants' conditions of confinement rise to the level of "flagrant abuses" or "shocking the conscience." When Defendants were rescued by U.S. authorities, they were adrift on the open sea in a stalled vessel and had not eaten for three days. *See* Evid. Hr'g at 192–93. During their confinement, Defendants' treatment by U.S. officials was logged daily. That log reveals Defendants were given food at least twice per day and water on a more regular basis. *See* Evid. Hr'g at 76. Defendants received medical treatment when required and, at times, saw doctors "at least daily, if not more than daily . . . for about [a] week." Evid. Hr'g at 76, 194–95. They were also consistently afforded showers and recreation as weather permitted. R&R at 17.

Defendants also point to other cases to demonstrate their treatment was part of a larger pattern of "repeated abuse" of MDLEA defendants. *See* Defs.' Obj. at 15 n.3. Yet this objection

fails to confront a fundamental reality of MDLEA interdictions: Defendants in this case (and many others similarly situated) were interdicted *in the middle of the ocean*.  At least some of the conditions they claim to "shock the conscience" stem from their capture approximately 1,000 miles off the coast of the mainland United States.[17]  Coast Guard vessels are not designed as floating Bureau of Prisons facilities; they are engineered to carry sailors safely and effectively on their day-to-day duties, and inherently lack the detention capacity and comforts which a mainland prison facility might afford.  *See* Evid. Hr'g at 53, 68, 84 (discussing the same).  In fact, during the September 16 evidentiary hearing, testimony revealed that Defendants' accommodations were not dissimilar to those enjoyed by U.S. mariners.  *See id.* at 68–69, 85, 193.  Finally, the Court recognizes the merit in the Government's (somewhat hyperbolic) observation that "the constant taxiing of detainees from the location of their interdiction to the United States would essentially cause all Coast Guard operations to cease."  Gov.'s Obj. at 3.

This discussion is not meant to imply that any delay between a high seas interdiction and presentment can be brushed off as reasonable or necessary.  It is only intended to suggest that Defendants' conditions of confinement do not constitute such an outlier as to reach the "higher threshold of government misconduct" necessary for this Court to dismiss an indictment using its supervisory powers.  The proper remedy for this and Defendants' other objections—a potential change in MDLEA detainees' conditions of confinement—is distinctly legislative.  The Court therefore declines to exercise powers "invoked primarily to preserve the integrity of the judicial system" solely to fix a problem most appropriately solved by Congress.

---

[17] *See, e.g.*, Defs.' Obj. at 14; Evid. Hr'g at 164 ("I understand the Coast Guard is not trying to mistreat our clients, but just by the very nature of being housed under a tarp on the deck of a Coast Guard cutter at sea is—it's inhumane to do this for an extended period of time.")

### IV. CONCLUSION

Accordingly, UPON CONSIDERATION of the Motion, the transcript of the September 16 evidentiary hearing, the R&R, both sets of Objections and Replies, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the R&R (ECF No. 51) is ADOPTED IN PART, and Defendants' Joint Motion to Dismiss Indictment (ECF No. 16) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this _9th_ day of November, 2022.

*[signature]*

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record